No.   91-312

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

IN THE MATTER OF PAUL GROVER MATT, III,

   Petitioner.

FILED

APR 2 - 1992

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

   For Petitioner:

      Carey  E.  Matovich,  Matovich,  Addy  &  Keller,
      Billings, Montana.

   For Respondent:

      Andrew P. Suenram, Attorney at Law, Dillon, Montana.

Submitted on briefs:   October 17, 1991

Decided:   April 2, 1992

Filed:

_____
                Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Petitioner Paul G. Matt, III, appeals from the final decision of the State Bar of Montana Committee on Character and Fitness refusing to certify petitioner to this Court for admission to the State Bar of Montana. We affirm the decision of the Committee.

We restate the issues for our review as follows:

1. What is the proper standard of review for the Court to apply to a decision of the Committee on Character and Fitness?

2. Did the Committee on Character and Fitness properly conclude that Mr. Matt is unfit to practice law in the State of Montana?

3. Did the Committee on Character and Fitness violate petitioner's constitutional right to due process?

On February 28, 1990, Paul G. Matt, III (Mr. Matt), filed his application for certification for admission to the State Bar of Montana. As the rules require, the application was referred for review to the State Bar's Committee on Character and Fitness (Committee). The Committee investigated and held three hearings. The first hearing, on June 27, 1990, was informal. Based on that hearing the Committee denied Mr. Matt's certification. Subsequently, a formal reconsideration hearing was held before the Committee on October 11, 1990. After the hearing, the Committee notified Mr. Matt by letter that they were still in the process of deliberating regarding Mr. Matt's Application for Admission and that pursuant to Rule 4(g) of the Committee's Rules of Procedure,

2

it was considering items discussed in the formal hearing as well as additional items not discussed at the formal hearing but previously submitted in the record. Rule 4 (g) provides that the Committee is not bound by the formal rules of evidence.

The Committee gave Mr. Matt the option of producing evidence regarding these additional factors in one of four ways: (a) a formal hearing held at the State Bar of Montana (State Bar) office; (b) a formal hearing held via conference call; (c) written argument; or (d) letting the record stand as stated in the transcript of the informal hearing. Mr. Matt, through his counsel of record, opted for a continuation of the formal hearing held at the State Bar office. A continuation of the formal hearing was held on February 13, 1991. On May 23, 1991, the Committee issued its Findings of Fact and Conclusions of Law denying certification of Mr. Matt to the Clerk of the Supreme Court for admission to the State Bar. Mr. Matt has petitioned this Court for review of the Committee's denial of his certification.

I

What is the proper standard of review for the Court to apply to a decision of the Committee on Character and Fitness?

This Court issued new rules regarding admission to the State Bar, effective January 17, 1991. Rules for Admission to the Bar of the State of Montana (1991), 247 Mont. 1. Those new rules provide the following standards for the Committee to follow.

Section IV:

. . .

3. Standard of Character and Fitness. Every applicant

3

for the Montana Bar Examination must be of good moral character. It shall be the responsibility of the applicant to demonstrate to the satisfaction of the Committee that the applicant would, if admitted to practice law in Montana, be able to act in accordance with the standards set forth in the Montana Rules of Professional Conduct, fairly, honestly, reasonably, and with unquestionable integrity in all matters in which he or she acts as an attorney at law.

4. Investigation of Applicants. The Committee shall process the applicant's Application and Questionnaire and, where necessary, otherwise investigate and make a determination of the character and fitness of each applicant to take the bar examination. . . .

7. Committee Hearings, Rules of Procedure & Appeals. Any problems that arise in the processing of an applicant's Application and Questionnaire may be discussed in informal communications between the Committee and the applicant. From time to time, substantial issues will arise which will require formal trial and hearing before the Committee which may result in the Committee's disapproving the applicant's application and finding a lack of appropriate character and fitness to take the bar examination or be admitted to practice in Montana. . . . The Rules of Procedure provide for a hearing process before the Committee and also provide for a manner of appeal to the Montana Supreme Court by an applicant who contests the final rulings of the Committee.

We also recently set forth the applicable standard of review for this Court to apply to a decision of the Committee on Character and Fitness in In the Matter of Kenneth J. Pedersen (Mont. 1991), 820 P.2d 1288, 48 St.Rep. 988. In that regard, we stated:

The Montana Constitution provides that this Court has the power and obligation to regulate the admission of attorneys to the Montana Bar. Mont. Const. art. VII, § 2, cl. 3. The Committee on Character and Fitness assists this Court in fulfilling its obligation to regulate the admission of attorneys in Montana. However, the ultimate decision regarding the admission of attorneys in Montana rests exclusively with this Court. Upon reviewing a final decision of the Character and Fitness Committee we will conduct an independent review of the entire record to determine if the Committee erred. When the facts are admitted and uncontested, as they are in this case, we will give due consideration to the inferences drawn by

4

the Committee, including inferences concerning rehabilitation and mitigation. Consideration will be given to the recommendation of the Committee as to whether the applicant is of the requisite good moral character and fitness to be admitted to the Montana Bar. The Committee will have heard testimonial evidence and will have had the opportunity to observe the demeanor and judge the credibility of the applicant or other witnesses. However, inasmuch as we are designated by the Montana Constitution to ultimately make this decision, we will affirm the Committee's recommendation if we determine it was correct, and we will reverse if we determine the Committee erred. Our review will be in accordance with the existing standards for admission, taking into consideration the whole record. (Emphasis added).

Pedersen, 820 P.2d at 1290.

II

Did the Committee on Character and Fitness properly conclude that Mr. Matt is unfit to practice law in the State of Montana?

The Committee Rules of Procedure, adopted in 1987, specifically placed the burden on the applicant to prove that he possessed "good moral character". In contrast, in 1988, this Court adopted Rules for Admission to the Bar (1988), 234 Mont. 1, 9, which provided that "good moral character shall be presumed by the Committee on Character and Fitness". The current 1991 Rules for Admission to the Bar adopted by this Court are consistent with the original 1987 Committee Rules in providing that the burden of proof is on the applicant to establish good moral character. See Pedersen, 820 P.2d at 1292.

In the initial hearing the Committee placed the burden of proof on Mr. Matt to establish his good moral character. To that extent the Committee erred because the first two hearings were governed by the 1988 Rules for Admission to the Bar in which good

5

moral character was to be presumed by the Committee. By the time of the third hearing, the rules had changed, and the burden could properly be placed on Mr. Matt.

We note that in Pedersen the burden of proof was also improperly placed on the applicant. This Court concluded that because the Committee specifically found that past conduct of the applicant would cause a reasonable person to believe he would be unable or unwilling to act in accordance with the standards set forth in the Montana Rules of Professional Conduct, the Committee's decision to deny the applicant's admission was justified. There is one significant difference between this case and Pedersen. In Pedersen, the facts were uncontested. In this case, there is a significant amount of conflict in the interpretation of Mr. Matt's testimony regarding his past actions. For that reason, we will discuss the conflicting testimony in detail.

In our review of the testimony and evidence, we will begin with the understanding that the good moral character of Mr. Matt is presumed. Mr. Matt maintains that he has established his good moral character and fitness to practice law in the State of Montana. He submitted with his application several letters from judges, attorneys and clients, attesting to his good moral character and fitness to practice law. He also submitted certifications from the bars of Colorado and Nebraska stating that he was a member in good standing at both Bars.

The Committee maintains that Mr. Matt failed to meet his burden of proof. It contends that it reviewed extensive regular

6

investigation materials, post regular investigation materials, and conducted three hearings with Mr. Matt present, and unanimously concluded that Mr. Matt was untruthful in his testimony before the Committee, and thus, failed to prove his good character.

A significant portion of the questioning of and testimony by Mr. Matt concerned an incident which occurred ten years ago in the State of Nebraska while Mr. Matt was a member of the Nebraska State Bar. The Committee made extensive findings of fact, of which the following are pertinent.

1. In June 1981, Mr. Matt was charged by the Counsel of Discipline of the Nebraska State Bar Association with Misconduct as a lawyer. The charges stemmed from Mr. Matt being charged in 1980 by the Lancaster County Attorney (Nebraska) for conspiracy to possess cocaine.

2. Matt completed a pre-trial diversion program and the criminal charges against him were dismissed.

3. The Committee on Inquiry of the First Judicial District of the State of Nebraska prepared formal charges against Mr. Matt. Upon review of the charges, the Disciplinary Review Board recommended that the Supreme Court of Nebraska issue a reprimand to Mr. Matt.

4. The Nebraska Supreme Court declined to accept the recommendation and upon de novo review, suspended Mr. Matt from the practice of law for one year. The Supreme Court's decision is reported in State, ex rel v Paul G. Matt, III, 213 Neb. 123, 327 N.W.2d 622 (1982).

5. Mr. Matt subsequently applied for and obtained reinstatement to the Nebraska State Bar in January 1984. In addition, he applied for and was admitted to the Colorado State Bar.

. . .

11. Mr. Matt has lead this Committee to believe his involvement in this matter was minimal. The Nebraska Supreme Court opinion demonstrates that Mr. Matt's role in this incident was much more involved, to the point of determining the amounts of cocaine that would be sold and

7

arranging the sale. The Committee finds that by downplaying this incident, Mr. Matt was not candid with the Committee regarding his involvement in the alleged conspiracy.

12. Mr. Matt testified at the June 27, 1990, hearing that he did not get anything out of the transaction with Gierlich, that he was not using drugs and he hadn't ever used drugs.

13. The Nebraska Supreme Court in its opinion states "the record reflects that prior to the events on March 1980, the Respondent had occasionally used marijuana personally and had purchased marijuana more than once from Gierlich who was a close personal friend." State v. Matt, 213 Neb. 123, 327 N.W. 2d 622, 623, (1982).

14. Mr. Matt was untruthful in the application process before this Committee. His misrepresentations are material to the issues before the Committee and lead the Committee to doubt his candor in other areas as well. (Emphasis supplied.)

On his application, Mr. Matt gave the following explanation for the charges that were filed against him in Nebraska.

This inquiry by the Nebraska State Bar Association resulted from charges being filed against me by the Lancaster County Attorney's Office in March of 1980 for conspiracy to possess cocaine. These charges were dismissed at the State's cost in May 1981 when it was accepted that I was not a part of the conspiracy. The charges were filed because of two telephone conversations I had with a close friend of mine in early March of 1980. I had not seen this friend for three or four months. She asked me if I knew where she might obtain some cocaine, and I told her I did not. She made further inquiries and asked if I knew anyone in Omaha. I told her that possibly the fellow living with my girlfriend in Omaha might know of someone. The telephone conversation was intercepted by law enforcement officers since my friend's live-in boyfriend was under surveillance. She was followed and ultimately arrested after the authorities charged that she purchased cocaine from the fellow in Omaha. (Emphasis supplied.)

At the first hearing before the Committee, Mr. Matt testified regarding the cocaine dealings as follows:

8

A.   [T]he essence of the charges by the State Bar, or the inquiry by the State Bar was because of charges filed against me by the Lancaster County Attorney's office, as I set forth.   That was based on a close friend of mine who I hadn't seen for four, five, six months calling me and asking me if she could find some drugs, and I said no.   She wanted to know where she could find some cocaine, and I said no.

She then asked me, "What about Omaha?"   I was living in Lincoln, and I had a girlfriend in Omaha who lived with a fellow that she also knew named Curt . . . . . I knew he knew a lot of people; he was the head maitre d' of a restaurant.   My girlfriend lived in the same house with him; and I said, "Well, why don't you try Curt."   <u>So when I talked to my girlfriend, I asked Curt if he could help Judy, and he said, "Probably."   So I had Judy call him</u>.

. . . She later was arrested, and because she had called me, they had charged me; and I went through a year of investigation and procedure with the Lancaster County Attorney's office until <u>they realized that I was not part of anything.   I was not getting anything out of it, I wasn't using drugs, **I hadn't ever used drugs**</u>, I wasn't involved in getting anything out of Judy's situation, and it was just a bad mistake on my part, obviously, to even comply with her request after I said no in the first place.

. . .

Q.    What did you have to do in the pretrial diversion?

A.    I had to do, I think 100 hours of community work, I had to read a couple books and make a report, and I had to talk to a member of the probation office, I think every month.

So after this was cleared up, then the Bar Association could look into it, and at that point, they did.   The Council on Discipline sent me a letter; they then had a full hearing in which there was seven members who had all the records of the Lancaster County Attorney and all the records of all the investigations. . . . They decided, after that, that due to all those circumstances and all the evidence they had, a reprimand was the appropriate discipline in my situation.

That was then sent to the Attorney General, who complied with it . . . I then went to the Supreme Court for approval.   The Supreme Court, without looking at any new evidence, just looking at exactly what took place as far as the transcript of my testimony and the evidence there, decided that that wasn't appropriate and that I should be suspended for a year, and they then did that.

9

(Emphasis added).

At the second hearing, Mr. Matt testified he himself made the phone call to "Curt" and then called Judy back the next day.

> Q. And then it's my understanding of your testimony in the last hearing that you told her about this guy named Curt who was living with your girlfriend.
>
> A. I told her no, and then she asked me, "What about Omaha?" . . .
>
> Q. Then did you call Curt and ask if he could help Judy?
>
> A. Judy called me on a Friday. I said that I'd check with Curt if I saw Shirley. Then Saturday morning, I saw Judy's note and thought, "Oh, that's right, I said I'd check with Curt," and then I called Curt. So it was the next morning.
>
> Q. So the transaction actually involved a couple phone calls.
>
> A. One phone call there, and then I called Judy back. (Emphasis added).

As pointed out by the Committee, the Nebraska Supreme Court opinion detailed Mr. Matt's involvement in the cocaine transaction. The opinion stated:

> The formal charges allege that on or about March 7, 1980, the respondent received a telephone call at his law office from a personal friend, Judy Gierlich. Gierlich asked the respondent where she could obtain some cocaine. The respondent first told her that he did not know, but on further questioning agreed to contact a friend of his in Omaha, Nebraska, concerning the availability of cocaine and then recontact her.
> On or about March 8, 1980, respondent called Gierlich at approximately 10:15 a.m. and told her that he had talked to the friend in Omaha and had been told that anything was available. At approximately 10:28 a.m. on the same day respondent received a telephone call from Gierlich. Respondent asked Gierlich what quantity of cocaine she intended to purchase. Respondent then gave the telephone number of the person in Omaha to Gierlich and advised her that he would also call again "to make

10

sure there's no problem."

  . . .

> The record reflects that prior to the events in March 1980 the respondent had occasionally used marijuana personally and had purchased marijuana more than once from Gierlich, who was a close personal friend. His conduct here was motivated by his friendship with Gierlich and he receive no remuneration for his efforts.

  . . .

> The Disciplinary Review Board recommended that the court issue a reprimand. . . .

> The recommendation was not accepted by this court and the matter was referred to a referee. The referee considered the matter solely upon the record a the hearing before the Committee on Inquiry. . . . [T]he referee . . . recommended that respondent be suspended from the practice of law for a period of 1 year, and that readmission be denied unless respondent made a satisfactory showing of rehabilitation from usage of controlled substances.

  . . .

> The referee specifically found that as a result of respondent's efforts Judy Gierlich was able to illegally purchase a controlled substance and respondent's personal acquaintance in Omaha was able to sell a controlled substance, and respondent knew, or had reason to know, that such would be the result of his efforts. (Emphasis supplied.)

State v. Matt (Neb. 1982), 327 N.W.2d 622.

Without contradiction, the record establishes that the Committee was correct in finding that Mr. Matt was untruthful in stating that he hadn't ever used drugs. The record clearly supports the finding that Mr. Matt attempted to lead the Committee to believe his involvement in the drug transaction was minimal, and that Mr. Matt was not candid with the Committee. The dissents focus on the number of phone calls made by Mr. Matt as being irrelevant. We have not emphasized the number of phone calls as

11

being significant. The key aspect is that Mr. Matt consistently attempted to minimize his involvement in the drug transaction and in the use of drugs. We point to one additional factor. The Committee had the opportunity to examine and observe Mr. Matt during the course of three separate hearings and had the corresponding opportunity to observe his demeanor and to judge his credibility. While we are required to make an original review of the record, we properly may consider the opportunity on the part of the Committee to evaluate the demeanor and to judge the candor of Mr. Matt. We do not have that opportunity. Our review of the record causes us to adopt the same findings as are above set forth on the part of the Committee.

As a result of its findings, the Committee reached the following conclusion:

> 5.   Mr. Matt has made false statements including omission to the Committee. He has failed to exhibit candor in the admissions procedure.

We affirm and adopt that conclusion.

In its conclusions the Committee stated that Mr. Matt had failed to carry his burden of proving that he possessed good moral character. As previously pointed out, this burden was improperly placed upon Mr. Matt with regard to the first two hearings. After our review of the record, we do not find that Mr. Matt was adversely affected in any way by the initial placement of the burden of proof upon him. Mr. Matt was competently represented by counsel who vigorously presented witnesses and arguments in his behalf, both before the Commission and before this Court. We

12

conclude that Mr. Matt had an adequate opportunity to present all information in his behalf and presented the same in considerable detail. We therefore affirm the conclusion by the Committee that Mr. Matt's conduct was not mitigated by any of the factors or circumstances which are contained in the record. After Mr. Matt's testimony in the course of the three separate hearings, the Committee concluded that it did not believe he could act fairly, discreetly, honestly, reasonably and with unquestionable integrity in all matters in which he would act as an attorney at law as required by Rule 3(a) of the Rules of Procedure of the Committee on Character and Fitness.

Notwithstanding the findings on the part of the Committee with regard to untruthfulness and lack of candor, Mr. Matt argues that the denial of his admission to practice is a double jeopardy penalty for a "mistake" he made ten years ago. We point out that the application signed by Mr. Matt stated:

> 5. I understand that if I have furnished significantly false or <u>incomplete</u> information, my application may be summarily rejected. . . . (emphasis added).

We conclude the record clearly establishes Mr. Matt's knowledge that he was required to furnish complete information, and that he failed to furnish such complete information. Mr. Matt is not being penalized for his "mistake" of ten years ago. He is being penalized for his present failure to give truthful and complete information to the Commission.

The dissents raise as an issue the Committee's conclusion that Mr. Matt violated Rule 8.2 of the Montana Rules of Professional

13

Conduct, when in response to the Committee's request that he speculate as to the reasons the Nebraska Supreme Court imposed the penalty, he suggested that it was the ill feelings towards Mr. Matt on the part of Chief Justice Krivosha which afforded a reason. At subsequent hearings Mr. Matt continued his attack on Chief Justice Krivosha. In view of the request by the Committee that Mr. Matt speculate as to the reasons for the conduct of the Nebraska court, we have concluded that we will not rule upon the issue regarding Justice Krivosha. We have concluded that we will disregard the Krivosha issue, and determine whether or not the record is otherwise sufficient to affirm the conclusion of the Committee.

In accordance with the standards set forth in Pedersen, we have reviewed the entire record and we have concluded that without regard to the Krivosha issue, the record supports the unanimous decision of the Committee. We hold that Mr. Matt is unfit to practice law in the State of Montana.

### III

Did the Committee on Character and Fitness violate petitioner's constitutional right to due process?

Mr. Matt maintains that he was denied his basic right to due process in violation of the Fourteenth Amendment to the United States Constitution and Art. II, Section 17 of the Montana Constitution. In support of this contention, he maintains that the scope of review at each of the three hearings was much more broad than he had reasonably expected from the notice he received prior to each hearing. The Committee maintains that Mr. Matt was

14

afforded proper due process under Rule 4(g) of the Rules of Procedure of the Committee on Character and Fitness (1987).

This issue was most recently addressed by this Court in Pedersen, 820 P.2d at 1291. In that case, this Court discussed the right to practice one's chosen profession.

> Prior to the 1972 Constitution, it was already recognized that the power to regulate the admission of attorneys in Montana was a matter peculiarly within the inherent power of this Court. Goetz. v. Harrison (1969), 153 Mont. 403, 404, 457 P.2d 911, 912.
>
> However, this power is subject to limits imposed by the Federal Constitution. As the United States Supreme Court has said:
>
> > A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.
>
> Schware v. Board of Bar Examiners (1957), 353 U.S. 232, 238-39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796, 801. Those bodies charged with investigating and making decisions upon an applicant's character and fitness to practice law in a particular jurisdiction must afford the applicant adequate due process of law. . . . The Court added that the right to engage in the practice of law is not and should not be a matter of grace and favor. Willner v. Committee on Character and Fitness (1963), 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224. In a concurring opinion in Willner, Mr. Justice Goldberg discussed the due process requirement in these cases:
>
> > The constitutional requirements in this context may be simply stated: in all cases in which admission to the bar is to be denied on the basis of character, the applicant, at some stage of the proceedings prior to such denial, must be adequately informed of the nature of the evidence against him and be afforded an opportunity to rebut this evidence.
>
> Willner, 373 U.S. at 107.

Rule 4(g) of the Rules of Procedure of the Committee on

15

Character and Fitness of the State Bar of Montana provides:

> (g)  The Committee shall not be bound by the formal rules of evidence.  It may in its discretion take evidence in other than testimonial form, having the right to rely upon records and other materials furnished to the Committee in response to its request for assistance in its inquiries.  The Committee may in its further discretion determine whether evidence to be taken in testimonial form shall be taken in person at the hearing or upon deposition, but all testimonial evidence shall in either event be taken under oath.  A complete stenographic record of the hearing shall be kept, and a transcript may be ordered by the Applicant at the Applicant's own expense.

In this case, the initial evidence was provided by Mr. Matt with his application for admission and the accompanying questionnaire.  He had access to the complete investigative file of the Committee and the complete transcripts of each hearing for his own review.  At each successive hearing, the Committee's questions became more detailed and specific.  Such questioning was the logical result as more information was disclosed during the course of the proceedings.

We point out that as discussed under Issue II, the Committee erred in imposing the burden of proof on Mr. Matt.  However, we conclude that he was in no way prejudiced or misled by that error.  He received proper notice of the hearings and had every opportunity to appear and participate in those hearings.

We conclude that the record does not establish that Mr. Matt was deprived of due process in any manner in the hearings before the Committee.  We further conclude that he was adequately informed of the nature of the evidence against him and was afforded an opportunity to rebut that evidence.  The requirements in <u>Pedersen</u>

16

were met.

We hold the Committee did not violate Mr. Matt's constitutional right to due process.

Affirmed.

_____
                              Justice

We Concur:

_____
            Chief Justice

_____

_____

_____

_____

_____
            Justices

17

Justice Terry N. Trieweiler dissenting.

I dissent from the opinion of the majority. The history of this matter indicates that the State Bar of Montana Committee on Character and Fitness decided early on not to certify the petitioner for admission to the Bar, and then over a long period of time groped unsuccessfully for reasons until it found one which petitioner was never given an opportunity to defend against. From the beginning this was a rejection looking for a reason.

The petitioner was denied the right to practice law in Montana for making inconsistent statements about his prior involvement in a drug transaction. However, any reasonable interpretation of his statement compels the conclusion that they were in no way inconsistent.

The petitioner was also denied admission for stating that he had never used drugs, when in fact a ten-year-old Nebraska Supreme Court decision refers to earlier use of marijuana. However, petitioner was never given the slightest prior indication that his immaterial statement regarding the use of drugs was one of the possible bases under consideration by the Committee for rejecting his application. He was asked no questions about that statement and never given an opportunity to reconcile that statement with the Supreme Court decision. How can the majority possibly conclude under those circumstances that he received adequate notice of the complaint against him and an opportunity to respond?

18

In order to fully understand just how unfair this result is to the petitioner, it is necessary to set out the chronology of events that led to the rejection of his application.

Paul Matt, III, was admitted to the practice of law in the state of Nebraska in 1971. He was admitted to practice in the state of Colorado in 1987.

At the time of his application for admission to practice in the state of Montana on February 28, 1990, he had been practicing law for 19 years, except for the period of his suspension, and had never had a client grievance filed against him in either state.

With his application, Matt submitted letters attesting to his good moral character from two judges, eight attorneys, and four non-attorneys, including two former clients. The attorneys included close working associates and former employers. Although one former employer stated that his firm declined to hire Matt on a full-time basis because of his prior disciplinary experience, even he attested to Matt's good moral character. In all the voluminous documentation that was submitted to the Committee on Character and Fitness, no person other than the Committee members questioned Matt's honesty, integrity, or competency to practice law.

In March 1980, Matt had been charged with conspiracy to deliver cocaine. However, he at no time admitted guilt and was never convicted of any crime. After completion of a pretrial diversion program, those charges against him were dismissed. As a result of those charges, Matt was investigated by the Disciplinary

19

Review Board of the Nebraska State Bar Association. After its investigation, that board recommended to the Nebraska Supreme Court that it issue a reprimand. That recommendation, however, was rejected by the Supreme Court and Matt was suspended from the practice of law in Nebraska from December 17, 1982, until he was reinstated on January 26, 1984.

In his application to practice in Montana, Matt reported the previous disciplinary proceeding and made a general statement of the basis for those proceedings. A Committee credit check on Matt also disclosed a prior lien by the federal government for income taxes that were due. Based on these two pieces of information, the Committee wrote to Matt on May 7, 1990, and advised him that the Committee had serious concerns about the disciplinary action in Nebraska and his neglect of financial responsibility. It advised him that for that reason the Committee could not certify him as fit to practice law in Montana. It also advised him that if he wished, he could appear personally before the Committee.

Matt exercised his right to a hearing and it was conducted on June 27, 1990. At that time, he was advised that the Committee was primarily concerned about the primary disciplinary action in Nebraska, the tax lien, and other matters that it would bring up later.

Matt explained that the tax liens were imposed based on an agreement with the IRS that he initiated himself, and that they had been fully satisfied and discharged in 1988. He also provided the Committee with copies of the lien releases.

20

He was questioned about his prior involvement in two civil lawsuits. He explained that one had been resolved and the other had been dismissed without any settlement.

When he was asked about the basis for the disciplinary action in Nebraska, he admitted that a friend asked him to help her find drugs; that he made a call to a person who could provide her with drugs; and that he made another call to his friend to refer her to the seller. That was the essence of what he did wrong. Whether there were two calls involved, or three calls involved, is really immaterial.

Matt explained that after being charged he was put in a pretrial diversion program, that he completed it successfully, and that the charges against him were dismissed. He also explained that after investigation the disciplinary committee of the Nebraska Bar recommended that he be reprimanded by the Supreme Court, but that the Supreme Court rejected that recommendation and suspended him for a year. He was asked by the Committee to speculate why the Supreme Court did not follow the Nebraska Committee's recommendation, and he speculated that it may have been because of hard feelings on the part of the chief justice with whom he had previously had an unpleasant adversarial relationship as an attorney.

At the first hearing, Matt was also questioned about a dispute that occurred with the purchaser of a home which he was renting. Apparently he had 30 days remaining on his rental agreement and the

21

purchaser wanted him to move out immediately after she purchased the building. He refused to do so.

Following that hearing, on August 1, 1990, the Committee wrote to Matt and notified him that pursuant to Section 4(b) of the Committee's rules, he was denied certification as fit to practice law in Montana. The Committee gave the following reasons:

Section 3(c)(1) Unlawful conduct, as evidenced by the conspiracy to deliver cocaine charge.

Section 3(c)(3) Making of false statements including omissions as evidenced by your omission regarding the above charge when being hired at Branny, Hillyard and Kudla, and also by the misinformation you gave concerning your relationship with Judge Krivosha, and

Section 3(c)(13) Disciplinary action by a lawyer disciplinary agency or other professional disciplinary agency of any jurisdiction as evidenced by your suspension in Nebraska.

In other words, the Committee's original decision was based on its conclusion that when Matt responded to their request that he speculate about the reason for his suspension by the Nebraska Supreme Court, he misrepresented that he had had an unpleasant prior adversarial relationship with its chief justice. They also concluded that when he was subsequently hired to work for a law firm in Colorado he made false statements by failing to advise that firm of his prior disciplinary experience in Nebraska. Finally, the Committee concluded that it was appropriate to continue punishing Matt for the error in judgment which led to his previous punishment by the Nebraska Supreme Court ten years earlier.

Matt was advised that under the Committee's rules he could request reconsideration and would be granted a formal hearing. He

22

made that request and the formal hearing was conducted on October 11, 1990.

At the second hearing, Matt introduced the complete file of the divorce case in which he and the former chief justice represented opposing parties. The records disclose a long, difficult struggle by Matt to discover documents which related to the financial condition of Krivosha's client. Between 30 and 40 letters were exchanged during Matt's effort to discover the information. Finally, he moved to compel discovery of the documents. Krivosha's response to that motion termed it frivolous and harassing. However, the motion was ultimately granted and the divorce was resolved in a manner favorable to Matt's client. It was only three years later that the question of Matt's suspension came before the Nebraska Supreme Court with Matt's former adversary then sitting as chief justice. It is not surprising that when invited by the Committee to speculate about the reason why the Supreme Court departed from custom and ignored its own disciplinary board's recommendation, Matt gave the answer that he did.

Matt also explained the circumstances under which he went to work for the Branny, Hillyard firm. At that time, he had moved to Colorado where he was studying to take the Colorado bar examination. He did not apply for a position as an attorney with the Branny, Hillyard firm, but only a clerkship. By then he had already been reinstated in Nebraska. He did not feel that his prior disciplinary proceeding was relevant to his application

23

because he was not being considered for a position as a practicing attorney.

Nearly one year later, in October 1987, he was notified that he successfully passed the bar, and at that point one of the partners in the firm offered him a regular job. Before accepting the job, he explained to that partner that he had been involved in the prior disciplinary proceeding in Nebraska and submitted a memorandum to the entire firm explaining what had happened. As a result of that knowledge, the offer of a job with the firm was withdrawn. However, even though he was not given a position as an associate, he remained with the firm as a clerk for another 14 months. He explained that when he applied for the clerkship position he was not asked about any prior problems and did not feel they were relevant because he was not applying for a position as an attorney.

At the second hearing, he was again examined about the drug transaction. He again explained that he had been requested by a friend to locate drugs for her. He called an acquaintance in another town. Then he called his friend back. His testimony was basically the same as it was at the first hearing. Furthermore, it was not Matt who characterized his series of conversations as "a couple of phone calls." It was the Committee member who questioned him. The point is that he explained the basic essence of the transaction. Whether it involved two or three telephone calls was totally irrelevant.

24

Following the second hearing, the Committee notified Matt that in addition to the matters with which it was previously concerned, it also wanted to consider the tax lien, the dispute that occurred while he was a tenant, and the two civil lawsuits with which he had been involved as possible bases for denying his certification. Therefore, a third hearing was set for February 13, 1991.

At the third hearing, Matt responded to the additional issues raised by the Committee. He explained that after he moved to Montana he had rented a home with an agreement that he could remain there until March 31. Shortly after the first of March the home was sold and the purchaser wanted him to move out immediately. He objected based on his rental agreement with the prior owner, but as an accommodation to the purchaser, eventually moved out on March 25, nearly a week early.

He pointed out again at the third hearing that the tax liens that had been placed against him in 1984 were not based on an audit, but in response to his voluntary acknowledgment that he owed taxes which he was unable to pay. He immediately entered into an agreement to pay the money in installments and satisfied the terms of the agreement in 1988. He explained that while he had been named a defendant in two civil suits based on business transactions, one had been fully settled to the apparent satisfaction of the parties, and the other had been dismissed, apparently for the reason that it had no merit in the first place.

No mention was ever made at the third hearing regarding the discrepancy in Matt's earlier testimony about drug use and the

25

contradictory remarks reported in the Nebraska Supreme Court's decision found at *State v. Matt* (Neb. 1982), 327 N.W.2d 622. In fact, when the counsel for the Committee indicated that the decision would be made part of the record, she made the following remarks:

> I don't have any further questions at this time, but I do have, going back to discussions we had in the previous hearing, an opinion from the Northwestern Reporter that involves your dismissal from the—or your suspension from the Bar there, in Nebraska. I don't have any questions to ask you about it, <u>because it doesn't contain anything that you didn't tell us about</u>, but I would like to submit a copy of that to the Committee for their file.

>     . . . .

> . . . To Paul's credit, I mean, I think that it pretty much goes along with what he has told the Committee, and it doesn't give any indication why the Court didn't go along with the recommendations of the finder of fact, whatever he was called, the special master. [Emphasis added.]

Not only was Matt not given notice that the Nebraska Supreme Court decision would form the basis of the Committee's finding that he had been untruthful; not only was he denied an opportunity to explain the discrepancy; but he was led to believe, at the only time when he could have refuted the Committee's finding, that the Committee considered the decision, in all important respects, consistent with his prior testimony. Therefore, Matt offered no further evidence at that time.

On May 22, 1991, the Committee found that Matt lacked sufficiently good moral character for admission to the State Bar of Montana and listed three reasons:

26

1. The Committee found that his version of the number of telephone calls involved in the drug transaction for which he was disciplined in Nebraska was inconsistent by one telephone call with the chronology reported in the Supreme Court's decision and that he was, therefore, not candid with the Committee.

2. The Committee found that contrary to his testimony on June 27 to the effect that he had not previously used drugs, he had purchased and used marijuana on more than one occasion.

3. The Committee found that when, in response to its invitation, he speculated about why the Nebraska Supreme Court had not followed its own board's recommendations and blamed Chief Justice Krivosha, his speculation violated Rule 8.2 of the Montana Rules of Professional Conduct. Rule 8.2 provides that:

> (a) A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer, or public officer, or of a candidate for election or appointment to judicial or legal office.

After a thorough review of the record, and the incredible series of proceedings conducted by the Committee, I strongly disagree with the Committee's findings and conclusions.

First, whether Matt had two conversations, three conversations, or twenty conversations with his friend for whom he arranged the purchase of illegal drugs, the number is totally immaterial. The essence of what he did wrong was arrange for a friend to purchase illegal drugs. He admitted that she called him. He admitted that he then contacted someone from whom she could

27

purchase drugs, and that he then called her back to refer her to the seller. Whether there was another call involved makes absolutely no difference, and the fact that Matt may have omitted mentioning a third call over ten years after the fact indicates nothing to me about any intention on his part to mislead the Committee.

Second, the Committee had no right to reject Matt's application on the basis of a misstatement which he was never even advised was the subject of concern to the Committee. The Committee's rules provide for notice; they provide for hearing; and they provide for reconsideration after an applicant is notified of the reasons for his rejection. In this case, Matt availed himself of every opportunity to be heard, and every time he was advised of another reason that the Committee was considering for rejecting his application, he was able to offer satisfactory evidence that the reason had no merit. Apparently frustrated by this process, the Committee simply decided to convict him of something which he had no prior notice of and no opportunity to rebut. How does the majority reconcile this with its prior decision in *In the Matter of Kenneth J. Pedersen* (Mont. 1991) 48 St.Rep. 988, wherein it stated that:

> Those bodies charged with investigating and making decisions upon an applicant's character and fitness to practice law in a particular jurisdiction must afford the applicant adequate due process of law. . . . The court added that the right to engage in the practice of law is not and should not be a matter of grace and favor. Willner v. Committee on Character and Fitness (1963), 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224. In a concurring opinion in *Willner*, Mr. Justice Goldberg discussed the due process requirement in these cases:

28

> "The constitutional requirements in this context may be simply stated: in all cases in which admission to the Bar is to be denied on the basis of character, the applicant, at some stage of the proceedings prior to such denial, <u>must be adequately informed of the nature of the evidence against him and be afforded an adequate opportunity to rebut this evidence.</u>"

*Willner*, 373 U.S. at 107. [Emphasis added.]

*Matter of Pedersen*, 48 St.Rep. at 989-90.

In this case, Matt was given no notice that a basis for denial of his application would be his statement that he had never consumed drugs, and he was afforded no opportunity to explain or reconcile the apparent contradiction in that statement and the statements made by the Nebraska Supreme Court. Denying his application on the basis that he had been untruthful to the Committee, therefore denied him due process of the law.

Finally, I find it simply preposterous that the Committee invited Matt to speculate about why the Nebraska Supreme Court rejected its disciplinary committee's recommendation, and then when he did so, used that speculation against him. The denial of his application on that basis is wrong for several reasons. First of all, he merely expressed an opinion, he did not make a statement that he knew to be false or with reckless disregard of the truth. Second, based upon the documentation subsequently provided by Matt, and Krivosha's apparently misinformed denial that he had ever even handled a case against Matt, it would appear that his opinion had some basis in fact. By no stretch of the imagination did the

29

opinion which the Committee expressly solicited violate Rule 8.2 of the Montana Rules of Professional Conduct.

For these reasons I dissent from the majority opinion. I would reverse the decision of the Committee on Character and Fitness. Whether Matt had the burden of proof or not, he has proven by more than a preponderance of the evidence that he is possessed of satisfactory moral character to practice law in the state of Montana.

A thorough review of this record can lead to only one conclusion. That is that both the Committee on Character and Fitness, and the majority of this Court, are bent on punishing Matt for an indiscretion committed over ten years ago--one for which he has already been punished and forgiven by the state of Nebraska and the state of Colorado. It is regretful that this applicant can never be forgiven in the state of Montana.

_____
Justice

Justice Karla M. Gray, concurring in part and dissenting in part.

I concur with the majority opinion as to issue one and I also concur with portions of that opinion as to issue two. I respectfully dissent as to issue three.

The Committee on Character and Fitness grounded its conclusion that Mr. Matt was unfit to practice law in Montana on Mr. Matt's supposed violation of Rule 8.2 of the Montana Rules of Professional Conduct, as well as his lack of candor and untruthfulness. The majority first correctly distances itself from the Committee's findings on the Rule 8.2 violation. It then concludes that it can affirm the Committee based on Mr. Matt's lack of candor and untruthfulness. I cannot agree.

Even considering the Committee's ability to observe Mr. Matt's demeanor and judge his credibility, it is my view that the record does **not** support a conclusion that Mr. Matt attempted to lead the Committee to believe that his involvement in the Nebraska drug transaction was minimal. Mr. Matt appeared before the Committee numerous times and was forthcoming in responding to all inquiries. Any minor discrepancies between his recollection of the events that took place a **decade or more** before these proceedings and the findings of the Nebraska Supreme Court cannot seriously or fairly be characterized as an attempt to mislead; much less do any such discrepancies support the majority's **"key aspect . . .** that Mr. Matt **consistently attempted** to minimize his involvement in the drug transaction. . . ."  (Emphasis added.)  The failure of both the

31

Committee and the majority of this Court to present specific record support for this nebulous basis for prohibiting Mr. Matt from being admitted to practice law in Montana highlights the fact that no such support exists.

This leaves as the sole ground of support for the Committee's action, and this Court's affirmance, only one statement made by Mr. Matt: the statement having to do with his drug use. That statement is characterized by both the Committee and the majority as an assertion by Mr. Matt that he had never used drugs. First, I am not convinced that this statement even rose to the level of an affirmative statement about his drug use. My reading of the paragraph of Mr. Matt's testimony at the June 27, 1990 hearing relied on by the majority suggests that the statement regarding drug use was merely a characterization of the ultimate opinions of the county attorney's office investigating the conspiracy with which Mr. Matt was charged, rather than an affirmative statement by Mr. Matt that he had never used drugs. Second, if this statement were an affirmative statement of lack of drug use and if it had been inquired into and indicated to be a concern, and if Mr. Matt subsequently had failed to persuade the Committee that the statement did not reflect a lack of candor, I would agree that it would provide a sufficient basis for a conclusion that Mr. Matt is unfit to practice law in Montana. But none of that occurred. For these reasons, I cannot agree that the Committee "properly" concluded that Mr. Matt is unfit to practice law here.

This leads directly to my dissent from the majority's

32

conclusion that Mr. Matt's constitutional right to due process was not violated. The majority correctly notes that the Committee's questions logically became more detailed and specific at each successive hearing. A fair reading of the record requires a corresponding conclusion that Mr. Matt addressed the Committee's concerns, to the extent those concerns were revealed to him, in a direct and responsive manner. Nothing that occurred reasonably could have alerted Mr. Matt to Committee concern over one statement---particularly one statement at the **initial** hearing which was **not** relied on by the Committee in its original refusal to certify Mr. Matt---in a very voluminous record. In light of Committee counsel's remark at the third hearing that he had no questions about the Nebraska Supreme Court opinion relating to Mr. Matt's suspension from the Nebraska Bar "because it doesn't contain anything you didn't tell us about . . .," the Committee's failure to give Mr. Matt an opportunity to respond to its concern regarding the one statement that he had never used drugs constituted a denial of his constitutional right to be "adequately informed of the nature of the evidence against him and be afforded an opportunity to rebut this evidence." In the Matter of Kenneth J. Pedersen (Mont. 1991), 820 P.2d 1288, 1291, 48 St.Rep. 988, 989-90, citing Mr. Justice Goldberg's concurring opinion in Willner v. Committee on Character and Fitness (1963), 373 U.S. 96, 107, 83 S.Ct. 1175, 1182, 10 L.Ed.2d 224, 232.

I would reverse the Committee's action to the extent it was based on the Rule 8.2 violation or an attempt to mislead, vacate

that portion of the Committee's findings and conclusions based on Mr. Matt's statement that he had never used drugs, and remand to the Committee for further proceedings relating solely to the statement about past drug use and for a final decision as to whether Mr. Matt is possessed of sufficient moral character to practice law in Montana.

_____
Justice

34

April 2, 1992

CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Carey E. Matovich
MATOVICH, ADDY & KELLER, P.C.
225 Petroleum Building
2812 First Avenue North
Billings, MT 59101

Annie M. Bartos, Chair
Character and Fitness Committee
P.O. Box 1051
Helena, MT 59624


Jan Weber, Admissions Coordinator
State Bar of Montana                    (Hand delivered)
26 N. Last Chance Gulch, Suite 2-A
Helena, MT 59624-0577

Andrew P. Suenram
Attorney at Law
P.O. Box 1366
Dillon, MT 59725


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy